UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| ERNEST LEE COX, JR., <br><br> Plaintiff, <br><br> v. <br><br> I. BAL, M. WILLIAMS, and T. PATTERSON, <br><br> Defendants. | No. 2:22-cv-00804 WBS EFB <br><br> MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION TO DISMISS |

----oo0oo----

Plaintiff, a state prisoner proceeding pro se, filed this civil rights action seeking relief under 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Eighth Amendment in connection with inmate housing placements at Mule Creek State Prison ("M.C.S.P.") during the COVID-19 pandemic. (See Docket Nos. 19, 27.)

The Magistrate Judge's findings and recommendations recommend denying defendants' motion to dismiss. (See Docket No. 49.) Neither side has filed objections to the findings and recommendations. Nevertheless, because defendants are entitled

1

to qualified immunity, the court declines to follow the Magistrate Judge's recommendation for the following reasons.

As the Supreme Court has instructed, qualified immunity is "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 237 (2009) (emphasis added). While addressing qualified immunity at the pleadings stage can "raise[] special problems for legal decision making," Keates v. Koile, 883 F.3d 1228, 1234 (9th Cir. 2018), the court must do so here. "[F]orc[ing] the parties to endure additional burdens of suit -- such as the costs of litigating constitutional questions and delays attributable to resolving them -- when the suit otherwise could be disposed of more readily" would impair the objectives of the qualified immunity doctrine. See Pearson, 555 U.S. at 237. Indeed, if the court were to put off addressing qualified immunity until summary judgment, that immunity would be "effectively lost." See id. at 231.

In determining whether a government official is entitled to qualified immunity at the pleadings stage, courts consider "(1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established." Keates, 883 F.3d at 1235 (cleaned up). The complaint here fails to satisfy either step of the analysis, and defendants are therefore entitled to qualified immunity.

I.  No Constitutional Violation

Prison officials violate the Eighth Amendment when they

are "deliberately indifferent" to a prisoner's serious medical needs. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000). The test for "deliberate indifference" is "that 'the official knows of and disregards an excessive risk to inmate health or safety . . . .'" Richardson v. Runnels, 594 F.3d 666, 672 (9th Cir. 2010) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Under this standard, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. "Mere negligence . . . without more, does not violate a prisoner's Eighth Amendment rights." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).

"[A] prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'" and therefore "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 844–45 (cleaned up). Thus, "[i]n examining whether a prison official subjectively acted with deliberate indifference to the risk of COVID-19, the key inquiry is not whether the official responded perfectly, complied with every CDC guideline, or completely averted the risk; instead, the key inquiry is whether [he] 'responded reasonably to the risk.'" Fuller v. Amis, No. 21-cv-127-SSS-AS, 2023 WL 3822057, at *4 (C.D. Cal. Apr. 13, 2023), report and recommendation adopted, 2023 WL 3819181 (C.D. Cal. June 2, 2023) (quoting Benitez v. Sierra Conservation Ctr., No. 1:21-cv-00370 BAM, 2021 WL 4077960, at *5 (E.D. Cal. Sept. 8, 2021)).

According to the First Amended Complaint, beginning in October 2020, "inmates infected with COVID-19 were housed in M.C.S.P. facility A, B, and C gyms . . . . As these gyms were filled to capacity, Facility D and E gyms were being used to house[] COVID-19 infected inmates; each gym [was] filled with 100 inmates.  Once facility D and E gyms were filled to capacity, Facility E building 20 became the COVID-19 overflow housing building."  (FAC (Docket No. 19) ¶ 14.)  However, these gymnasiums were obviously not originally designed or intended to serve as hospital infirmaries, and in response to inmate complaints concerning poor conditions, a fire marshal inspected the D and E gyms and ordered that all the inmates be removed from those facilities.  (See id. ¶ 17.)  Thirteen of those inmates were moved into facility D building 16, where plaintiff resided, but were housed in the "multi-purpose rooms" and "mental health program rooms" rather than the regular cells.  (Id. ¶ 19.)  The COVID-infected inmates shared circulated breathing air, showers, and telephones with plaintiff and the other non-infected inmates. (Id. ¶ 23-24.)  The movements of the COVID-infected inmates were not controlled and they were able to "move freely all day."  (Id. ¶ 24.)

The prison offered single cell housing to patients considered medically high risk, and required those inmates to sign waivers if they refused the single cell housing.  (Id. ¶ 26.)  These cells were also obviously not originally intended or designed for this purpose, and while plaintiff was not offered a single cell, defendants represented that they did not have adequate space to house all of the high-risk inmates in single

4

1  cells.  (Id. ¶¶ 25-26.)  Non-infected inmates were tested for
2  COVID twice weekly.  (Id. ¶ 22.)  On January 5, 2021, plaintiff
3  tested positive for COVID-19.  He was then required to move to
4  Facility E building 20, the "COVID-19 overflow building."  (Id. ¶
5  27.)

6  As this court has previously explained, COVID-19 was a
7  "quickly evolving area of science . . . about which scientific
8  conclusions have been hotly contested."  See Høeg v. Newsom, 652
9  F. Supp. 3d 1172, 1188 (E.D. Cal. 2023).  This court has also
10 previously noted "the various discrepancies and shifts in [public
11 health] recommendations concerning COVID-19," see Kory v. Bonta,
12 No. 2:24-cv-00001 WBS AC, 2024 WL 1742037, at *9 (E.D. Cal. Apr.
13 23, 2024), which may well have added to the uncertainty faced by
14 prison officials trying to stem the spread of the disease.  The
15 novel nature of COVID-19 and the atmosphere of confusion
16 concerning the proper methods of addressing it are particularly
17 salient here given that the events alleged in the complaint
18 occurred in late 2020, less than a year into the pandemic.

19 With this context in mind, it is clear that the prison
20 officials were trying to do the best they could in unprecedented
21 circumstances.  The allegations of the complaint acknowledge that
22 officials were making real efforts to contain the spread of
23 COVID-19.  They had transformed gym facilities into makeshift
24 quarantine housing for the infected inmates, but were forced to
25 move those inmates back to the regular housing buildings.  Even
26 so, officials continued to try to keep the infected inmates
27 separate from the rest of the population by housing infected
28 inmates in the multi-purpose and mental health rooms and offering

medically vulnerable inmates single cells to the extent possible. The prison also maintained a frequent testing protocol and moved inmates who tested positive -- including plaintiff -- out of the general housing areas where possible.

Moreover, the circumstances faced by the officials here underscore just how limited their options were. By the very nature of a prison, officials are extremely constrained by existing facilities. Add to that the decision of the fire marshal that officials were barred from using the gymnasium buildings, and a picture of officials stuck between a rock and a hard place emerges. Officials had to comply with the orders of the fire marshal to ensure that conditions were not unsafe in case of fire, while also trying to maintain adequate spacing and isolation of inmates to prevent the spread of COVID-19, with access only to the necessarily limited facilities and resources available in the prison context. The complaint provides no plausible suggestion of what else defendants could or should have done differently under these constraints. Even plaintiff acknowledges that it was "impossible to practice six-feet social distance" in the building where he was housed. (See FAC at p. 11.)

While the solutions implemented by prison officials may not have been perfect, in that there was some contact between infected and uninfected inmates, their actions were plainly sufficient to "ensure reasonable safety" in the face of a novel public health crisis, see Farmer, 511 U.S. at 844-45, given that "proximity to other inmates is an unavoidable condition of confinement," Richardson v. Allison, No. 1:21-cv-00070 BAK GSA,

1  2022 WL 1409835, at *6 (E.D. Cal. May 4, 2022), <u>report and</u>
2  <u>recommendation adopted</u>, 2022 WL 2080054 (E.D. Cal. June 9, 2022).
3  Accordingly, the conduct of the defendants does not rise to the
4  high level of deliberate indifference.  See <u>Toguchi</u>, 391 F.3d at
5  1060 (deliberate indifference is a "high legal standard").
6       To the contrary, "[t]he very fact that [d]efendants . .
7  . enacted such policies supports that they have <u>not</u> been
8  subjectively indifferent to the risks poses by COVID-19."  See
9  <u>Gonzalez v. Kline</u>, 464 F. Supp. 3d 1078, 1090 (D. Ariz. 2020)
10 (emphasis added); <u>see also</u> <u>Fields v. Sec'y of CDCR</u>, No. 2:21-cv-
11 00548 KJM EFB, 2022 WL 2181997, at *6 (E.D. Cal. June 16, 2022),
12 <u>report and recommendation adopted</u>, No. 2:21-cv-0548 DAD EFB, 2022
13 WL 4124865 (E.D. Cal. Sept. 9, 2022) (the plaintiff's "wish for
14 more rigorous [COVID-19] protocols, and/or his preference to be
15 single-celled" were not sufficient to establish deliberate
16 indifference); <u>Lucero-Maney v. Brown</u>, 464 F. Supp. 3d 1191, 1211
17 (D. Or. 2020) ("The Court cannot fault [the prison], which has no
18 control over the number of [inmates], for failing at the
19 impossible task of maintaining six feet between all [inmates] at
20 all times.").
21       Accordingly, plaintiff has failed to plead that
22 defendants' conduct violated the Eighth Amendment.
23 II.  <u>No Violation of a Clearly Established Right</u>
24       Even if the facts alleged here constituted an Eighth
25 Amendment violation, plaintiff has not pled that defendants
26 violated clearly established law.  "The relevant, dispositive
27 inquiry in determining whether a right is clearly established is
28 whether it would be clear to a reasonable officer that his

7

conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001); see also Keates, 883 F.3d at 1235 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)) ("At the pleadings stage, defendants are entitled to qualified immunity unless plaintiff sufficiently pleads violation of a "clearly established constitutional right[] of which a reasonable officer would be aware 'in light of the specific context of the case.'").

It is clearly established law that prison officials violate the Eighth Amendment when they are "deliberately indifferent to the exposure of inmates to a serious, communicable disease." Helling v. McKinney, 509 U.S. 25, 33 (1993). However, qualified immunity should not automatically be denied in every case involving contagious diseases, and to conclude otherwise would defy the Supreme Court's admonition "not to define clearly established law at a high level of generality." See Kisela v. Hughes, 584 U.S. 100, 104 (2018). "[D]etermining whether the law was clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Hampton v. California, 83 F.4th 754, 769 (9th Cir. 2023), cert. denied sub nom. Diaz v. Polanco, 144 S. Ct. 2520 (2024) (quoting Saucier, 533 U.S. at 201).

That an inmate was exposed to a serious, communicable disease such as COVID-19 does not itself alone make out a violation of clearly established law. See Hines v. Youseff, 914 F.3d 1218, 1230-31 (9th Cir. 2019) (granting qualified immunity to prison officials accused of violating Eighth Amendment by exposing inmates to heightened risk of Valley Fever). As the preceding section indicates, far more than that is required. And

under the particular circumstances facing the prison officials here, it would not have been "clear" to "every reasonable official . . . that what he is doing is unlawful." See Dist. of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (quotation marks omitted).

In Hampton, the Ninth Circuit considered whether prison officials were entitled to qualified immunity from Eighth Amendment claims premised on their transfer of inmates from one prison, the California Institution for Men ("CIM"), to another, San Quentin. 83 F.4th at 759. As of May 2020, CIM had already faced a severe outbreak with nine inmates dead and over six hundred infected. The officials were aware that, in contrast, San Quentin had no known cases of COVID-19 at the time, as well as that containing an outbreak at San Quentin would be especially difficult due to its unique design and facilities. Id. Nonetheless, the officials decided to transfer over a hundred CIM inmates to San Quentin, most of whom had not been tested for COVID-19 for over three weeks and none of whom were adequately screened for symptoms prior to transfer. Id. Although some inmates started experiencing COVID-19 symptoms while en route to San Quentin, the buses did not turn back, and none of the inmates were quarantined upon arrival, but rather were placed into a housing unit with other inmates. Id.

The transfer occurred following a conference call during which the Marin County Public Health Officer warned defendants of the high risk posed by the transfer and advised defendants to take measures to prevent the spread of COVID-19, which they ignored. Id. at 759-60. After the transfer,

1    defendants were further warned that the transfer could lead to a
2    health care crisis and were advised to, among other things,
3    provide personal protective equipment and institute a COVID-19
4    testing protocol.  Defendants did not implement those
5    recommendations, even refusing an offer from a lab to provide
6    free testing.  Id. at 760.  By August, more than 2,000
7    individuals -- more than two-thirds of the inmate population --
8    at San Quentin had been infected.  Id.

9         The Ninth Circuit concluded that the prison officials
10   were not entitled to qualified immunity, reasoning that the
11   outbreak at San Quentin could have been avoided or at least
12   mitigated had officials chosen to transfer the inmates to a less
13   high-risk prison or implemented the recommended available safety
14   measures.  "In other words, as alleged, a good option did exist .
15   . . . [H]ad Defendants tried, they could have moved the CIM
16   inmates without exposing other inmates to an unreasonable risk."
17   Id. at 771.

18        In stark contrast to the facts alleged in Hampton,
19   there is no indication that officials here were presented with
20   recommendations from public health experts that they chose not to
21   comply with, nor does it appear that there was some alternative
22   "good option" by which officials could have mitigated the spread.
23   To the contrary, the First Amended Complaint indicates that
24   prison officials tried to implement the options available to them
25   using the limited resources at their disposal.  Under these
26   facts, it would not have been clear to a reasonable officer that
27   the actions taken by defendants leading to plaintiff's COVID-19
28   exposure were "unlawful in the situation he confronted."  See

10

Saucier, 533 U.S. at 202.  Plaintiff has thus failed to plausibly plead that defendants violated a clearly established right.

As the Supreme Court has taught us, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  There is nothing in the record to permit an inference that defendants here were either plainly incompetent or knowingly violated the law.  Accordingly, even if the court were to conclude that defendants' conduct violated the Eighth Amendment, at the very least they would be entitled to qualified immunity because plaintiff has not alleged a violation of a clearly established right.

IT IS THEREFORE ORDERED that defendants' motion to dismiss (Docket No. 43) be, and the same hereby is, GRANTED.[1]  The Clerk of Court is directed to close this case.

Dated:  December 3, 2024

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

[1] The court declines to grant leave to amend as "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010).

11